UNITED STATES of America

v.

James H. PIPER and N. Thompson Holloman.

Crim. No. 87–9–ATH (WDO).

United States District Court, M.D. Georgia, Athens Division.

March 8, 1988.

Edgar W. Ennis, Jr., Macon, Ga., for plaintiff.

O. Hale Almand, Jr., Macon, Ga., for defendants.

## ORDER

OWENS, Chief Judge.

Before this court is defendant Dr. James H. Piper's motion to suppress certain statements given by him and records obtained from him during an investigation conducted by the Internal Revenue Service ("IRS") between August of 1984 and April of 1985. Defendant first contends that the investigation leading to the indictment of Dr. Piper was improperly referred from the Criminal Investigation Division ("CID") of the IRS to the Civil Examination Division and that, pursuant to the referral and under the auspices of conducting a routine civil examination, the civil division conducted what was in reality a criminal investigation. Defendant argues that such actions violate internal policies established by the IRS, policies the violation of which allegedly implicate the defendant's rights to due process of law. Further, defendant argues that the referral to and the subsequent civil examination by the Civil Examination Division constitute an elaborate ruse by which the IRS sought to deceive the taxpayer into cooperating with what all along was a criminal investigation, conduct which would violate defendant's Fourth Amendment rights as explained in *United States v. Tweel,* 550 F.2d 297 (5th Cir.1977).[1] Finally, defend-

ant contends that, even if the initial referral to the civil division was proper, Revenue Agent Johnny E. Hyers inappropriately continued to gather information from the taxpayer long after he should have been aware of "firm evidence of fraud." Agent Hyers' conduct, defendant contends, violated published policies of the IRS and permitted him to gather additional information otherwise not available to the agency.

This court conducted a two-day hearing on defendant's motion. After a thorough review both of the evidence presented therein and of the pleadings and the relevant case law, this court issues the following order.

Facts:

Acting upon certain suspicions, the First National Bank of Elberton, Georgia, employed Burke–Bruner & Company, Associates, Certified Public Accountants, to conduct an audit focusing upon the excessive usage of bank money orders by Thompson Holloman, a Vice–President of the bank. The audit began on February 14, 1983, and Burke–Bruner submitted its report to the bank by letter dated March 8, 1983. *See* Defendant's Brief in Support of Motions, Docket No. 14, Exhibit 1. That report documented an unusual economic relationship between Holloman and Dr. Piper. The report made the following findings: (1) Holloman held Dr. Piper's unlimited power of attorney; (2) Holloman and Piper shared a safe deposit box; (3) Holloman converted large amounts of cash and checks payable to Dr. Piper into money orders which were then used both to purchase municipal securities, EE bonds, Treasury Bills and Notes and to pay other personal and business obligations of Dr. Piper.

By letter dated March 15, 1983, the bank forwarded a copy of the report to the Deputy Comptroller of the Sixth National Bank Region. By letter dated March 31, 1983, Mr. H. Gary Pannell, Regional Counsel, Comptroller of the Currency, transmitted the report to Mr. Michael J. Murphy, Acting Regional Commissioner of the Internal

---

1. *See Bonner v. Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*), where the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

Revenue Service. Mr. Pannell notified Dr. Piper of this transmittal to the IRS by letter dated March 31, 1983. By an IRS memorandum dated April 6, 1983, the bank audit report was assigned to the Augusta, Georgia group of the Criminal Investigation Division for analysis and evaluation. *See* Exhibits submitted during Hearing on Motion to Suppress, Defendant's Exhibits 2, 3, 4 and 19.

■ Special Agent James Rodgers of the CID conducted the investigation into Dr. Piper's financial affairs. He requested Dr. Piper's tax returns, and, upon receipt of those returns, he analyzed their content. He researched property records in the county courthouse, and he drove by and inspected Dr. Piper's home and office. Special Agent Rodgers read and analyzed the Burke–Bruner report, and he wrote to the First National Bank requesting access to its records.[2] Based upon his investigation, Special Agent Rodgers determined that this matter had no criminal potential. He was unable to ascertain, using the information available to him, who had earned the funds used to purchase the assets or who presently owned the assets that had been acquired. Further, Special Agent Rodgers was unable to determine whether the cash and checks used to purchase the money orders had been reported in Dr. Piper's income. Based upon Special Agent Rodgers' recommendation, the matter was referred to the Civil Examination Division in late July or early August of 1984.

Pursuant to this referral, Revenue Agent Hyers assumed control of the civil audit. He interviewed Dr. Piper and Ms. Marie Jones, Dr. Piper's bookkeeper. Revenue Agent Hyers obtained copies of Dr. Piper's records of income and the bank deposit books. He caused a summons for records to be served on the First National Bank, and he met with and received information and records from Marion Fortson, a Certified Public Accountant who had prepared certain tax returns for Dr. Piper.

Sometime in early October of 1984, Dr. Piper retained as his representative Mr. Thomas R. Waters, a former Special Agent with the CID. On October 10, 1984, a meeting was held at the offices of Mr. Fortson. In attendance were Mr. Fortson, Mr. Waters, Revenue Agent Hyers, and Mr. John McGuire, an associate of Mr. Waters at the time of this meeting. These individuals, with the exception of Revenue Agent Hyers, all testified that, in response to questions from Mr. Waters, Revenue Agent Hyers categorized the examination into Dr. Piper's income as a routine audit. Mr. Fortson also testified that he had received a copy of the audit report and that he had questioned Dr. Piper's bookkeeper about certain financial practices. *See* Transcript of Hearing on Motion to Suppress, Vol. I, pp. 264–66.

By letter dated October 22, 1984, Mr. Waters informed Revenue Agent Hyers that in light of the "dominant criminal overtones" of the inquiry into Dr. Piper's affairs, he was recommending that Dr. Piper furnish no additional information to agents of the IRS. *See* Defendant's Brief in Support of Motions, Docket No. 14, Exhibit 13. Revenue Agent Hyers served a summons for records on Dr. Piper in January, 1985. Over the next two months, defendant's representatives provided Mr. Hyers with some, though not all, of the requested records. On or about February 26, 1985, Revenue Agent Hyers informed Mr. Waters that, based upon an analysis of the bank's records, computations had revealed a possible understatement of income for certain years. Mr. Waters offered no explanation for the understatement either at that time or during a subsequent discussion in late March of 1985.

Absent an explanation from the taxpayer, Revenue Agent Hyers referred the matter back to the CID on April 5, 1985. Such referral was based upon Hyers' determination that Dr. Piper had willfully understat-

---

**2.** This request was refused. The bank suggested that Special Agent Rodgers use the agency's subpoena power as a means of protecting the bank from problems regarding disclosure. This subpoena power was not utilized because, at this time, the CID had not identified the investigation as one worthy of a full-blown criminal investigation. Subpoena power attaches only to investigations so identified.

ed his income. Dr. Piper was indicted on August 5, 1987, for the offense of tax evasion in violation of 26 U.S.C. § 7201.

Discussion:

In his motion to suppress, defendant has launched a two-pronged attack upon the government's conduct. The primary thrust of defendant's motion focuses upon the conduct of Revenue Agent Hyers. Defendant vigorously asserts that Hyers' conduct violated the doctrine enunciated in *Tweel*. Defendant's second avenue of attack, that Special Agent Rodgers and Revenue Agent Hyers violated IRS policies and procedures and that they colluded to pursue a criminal investigation under the guise of a civil examination, is a contention that the government violated defendant's rights to due process of law.

Such assertions raise important questions regarding the nature of the relationship between government and private citizens.

Inherent in our democracy is a belief. that, since the government represents the will of the people, the people will accept its dictates voluntarily. There is a sense of trust between the government and the people.... [Therefore], a private person has the right to expect that the government, when acting in its own name, will behave honorably. When a government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the agent's representations. [It is] clearly improper for a government agent to gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust.

*S.E.C. v. ESM Government Securities, Inc.*, 645 F.2d 310, 316 (5th Cir. Unit B 1981) (holding that fraud, deceit or trickery is grounds for denying enforcement of an administrative subpoena).[3] If the evidence presented in this case were to establish a breach of the above-described trust, this court would not hesitate to suppress the evidence gathered pursuant to such betrayal. However, the evidence does not establish such a breach.

 *Tweel* holds that "a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of the Internal Revenue agent." *Tweel*, 550 F.2d at 299. "A party alleging ineffective consent on this ground must show affirmative acts by the agent that materially misrepresent the nature of the inquiry, and the showing must be by clear and convincing evidence." *United States v. Wuagneux*, 683 F.2d 1343, 1347 (11th Cir.1987). Silence may vitiate consent "where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading." *United States v. Prudden*, 424 F.2d 1021, 1032 (5th Cir.1970), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970), cited with approval in *Tweel*, 550 F.2d at 299, and in *Wuagneux*, 683 F.2d at 1347–48.

Defendant insists that several factors support his contention that the consent in this case was less than voluntarily given and that it was achieved pursuant to material misrepresentations upon which defendant relied to his detriment. These factors as alleged by defendant include the following: (1) violations of IRS policies and procedures; (2) silence by the agents in the face of inquiries concerning the nature of the investigation; (3) false representations regarding the routine nature of the investigation; and (4) the underhanded nature of the investigation as evidenced by the concerted action of Special Agent Rodgers and Revenue Agent Hyers.

 The IRS provisions at issue in this case regulate the assignment of tasks between the different units of the IRS. These internal rules of agency procedure confer no substantive rights or privileges upon taxpayers. *Groder v. United States*, 816 F.2d 139, 142 (4th Cir.1987). Absent a showing that the agents in question pro-

---

**3.** The Eleventh Circuit adopted as binding precedent all decisions of Unit B of the Fifth

Circuit in *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982).

ceeded in bad faith, the violations of these guidelines, if indeed such violations occurred, are in themselves insufficient to mandate the suppression of evidence in a criminal trial. *Id.* *See United States v. Caldwell,* 820 F.2d 1395 (5th Cir.1987); *United States v. Powell,* 835 F.2d 1095 (5th Cir.1988). Such violations may be relevant, however, to the issue of bad faith. *Groder,* 816 F.2d at 142. Further, the Supreme Court has held that an executive agency's egregious misinterpretation of its own guidelines can raise constitutional questions. *United States v. Caceres,* 440 U.S. 741, 752, 99 S.Ct. 1465, 147–72, 59 L.Ed.2d 733, 744 (1979).

In *Caldwell,* the CID learned of defendant's activities through an informant. After determining that the evidence failed to show distinct and substantial evidence of fraud, the CID referred the matter to the Civil Examination Division. Following an extensive investigation, the civil division referred the matter back to CID. The court found no evidence suggesting that CID had referred the matter to the civil division for the purpose of conducting a clandestine criminal investigation. *Caldwell,* 820 F.2d at 1400. The court further held that the referral back to CID was a discretionary decision and that "no absolute criterion established when an investigation should be suspended and the case referred for a criminal investigation." *Id.* at 1402, citing *Groder,* 816 F.2d at 143.

The situation before this court is analogous to the situation in *Caldwell.* The CID, after gathering information for a substantial period, determined that the investigation had no criminal potential. That Special Agent Rodgers' decision is contrary to the opinion expressed by former CID agents testifying in defendant's favor does not lead to the conclusion that Special Agent Rodgers either intentionally violated IRS policies or erroneously referred the matter to the Civil Examination Division. While noting that the CID's initial investigation was perhaps less than vigorous, this court determines that the referral to the civil division was proper.

As stated previously, the decision to refer a matter from the civil division to the CID is a discretionary one. While a civil examination should be halted upon a finding of "firm indications of fraud," such a finding must be distinguished from either a first indication or a mere suspicion of fraud. "If a firm indication of fraud is taken to mean the same thing as a mere suspicion, taxpayers would be subject to fraud investigations as a matter of course, and the revenue agent would have to cease almost before he started his investigation." *Groder,* 816 F.2d at 143, quoted in *Caldwell,* 820 F.2d at 1402; *Powell,* 835 F.2d at 1100. The civil examination division has an obligation to preclude innocent explanation for unreported income and to develop the case in sufficient detail "to determine whether a criminal investigation is warranted." *Caldwell,* 820 F.2d at 1402–03. Thus, a revenue agent behaves properly when she delays referring a matter to CID to permit the taxpayer to explain unreported or underreported income. *Groder,* 816 F.2d at 144; *Caldwell,* 820 F.2d at 1403.

Revenue Agent Hyers conducted a thorough examination into the financial affairs of Dr. Piper. By February 26, 1985, Revenue Agent Hyers presented taxpayer's representative with an understatement of income. On that occasion, and again in late March of that year, Revenue Agent Hyers solicited an explanation for the understatement. None was forthcoming. Thus, on April 5, 1985, the matter was referred back to CID. This court finds Revenue Agent Hyers' conduct consistent with the law. No evidence establishes the existence of concerted action by Special Agent Rodgers and Revenue Agent Hyers. No evidence establishes that Revenue Agent Hyers was conducting a clandestine criminal investigation. Nor does evidence exist which establishes that he violated IRS policies and procedures with regards either to the examination or to the referral. Revenue Agent Hyers properly offered Dr. Piper an opportunity to explain the understatement of income, and the delay in referral pursuant to that offer was well-intentioned.

■ This court must now consider defendant's assertions that the government's representations and/or silence deceived defendant and induced his voluntary consent. These arguments strike at the heart of the *Tweel* doctrine. The only affirmative statement which defendant identifies as a material misrepresentation is Revenue Agent Hyers' alleged characterization of the examination as either a "routine civil audit" or a "routine audit," a characterization the IRS has deemed impermissible. Assuming without deciding that Revenue Agent Hyers did use the forbidden phrase, that fact alone does not establish a material misrepresentation. This examination was in fact a civil examination; it was not a criminal investigation. Revenue Agent Hyers' characterization was not a misrepresentation. Unlike *Tweel*, where the revenue agent represented the audit as routine when in fact the audit was conducted at the specific request of the Organized Crime and Racketeering Section of the Justice Department, the examination of Dr. Piper's financial affairs did not have its genesis in a secret criminal investigation.

As to defendant's allegations regarding silence, the law is clear that revenue agents, unlike special agents, have no duty either to provide *Miranda*-like warnings or to advise taxpayers that a routine civil audit may lead to criminal proceedings. *Wuagneux*, 683 F.2d at 1348; *Powell*, 835 F.2d at 1099; *Caldwell*, 820 F.2d at 1399. Nor can defendant prevail by arguing that the agent's refusal to agree with defendant's characterization of the examination as one with dominant criminal overtones constitutes a type of silence or a refusal to answer truthfully an inquiry. The IRS must categorize and conduct its examination pursuant to the evidence, not pursuant to a taxpayer's characterization. To state that criminal overtones are present is to state the obvious—a routine civil audit *may* in any situation lead to criminal proceedings, a point an agent is not obligated to make and one a businessman is charged with knowing.

Further, the court notes that at no time was defendant deceived or misled. From the outset, defendant was aware of the audit report, and he knew that it had been referred to the IRS by the Regional Counsel of the Comptroller. His own representative cautioned him about the criminal implications of the report, and the same representative informed the IRS by letter that the taxpayer would no longer voluntarily cooperate. Thus, even if this court were to agree that the government's conduct was in bad faith and that it had engaged in deceitful activities, defendant's motion would fail because he can show no reliance. *See Caldwell*, 820 F.2d at 1399.

Defendant has failed to convince this court by clear and convincing evidence that the government acted in bad faith. The agents in question did not violate IRS policies and procedures, nor did they conspire to conduct a clandestine criminal investigation into the financial affairs of defendant Dr. Piper. Further, Revenue Agent Hyers made no misrepresentations either in an affirmative fashion or through silence. Any characterization of the civil examination as a routine civil audit was not a misrepresentation but a true statement. Silence may vitiate consent only where there is a duty to speak; Revenue Agent Hyers had no duty to speak. Therefore, defendant's motion to suppress premised upon a violation of the *Tweel* doctrine is DENIED.

■ Defendant's second assertion, that the government's violation of IRS policies and procedures mandates the suppression of certain evidence on due process grounds, is without merit. First, this court has determined that no such violations occurred. Second, and more importantly, the Supreme Court has held that the due process clause is not implicated unless "an individual has reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency." *Caceres*, 440 U.S. at 752–53, 99 S.Ct. at 1472, 59 L.Ed.2d at 744. Defendant did not reasonably rely upon agency regulations because those regulations were not promulgated for his benefit. The regulations were devised for intra-agency use. *See Groder*, 816 F.2d at 142. Thus, defendant's motion to

suppress upon due process grounds is also DENIED.